IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
July 25, 2001 Session

## STATE OF TENNESSEE v. JAMES WESLEY STROMBERGH

**Direct Appeal from the Criminal Court for Hamilton County**
**No. 231795      Stephen M. Bevil, Judge**

---

**No. E2001-00199-CCA-R3-CD**
**March 22, 2002**

---

A Hamilton County jury found the Defendant guilty of third offense driving under the influence and imposed a fine of $10,000. The trial court sentenced the Defendant to eleven months and twenty-nine days' incarceration, ordered him to attend an alcohol rehabilitation program, and revoked his license for a period of five years. In this appeal as of right, the Defendant contests the sufficiency of the convicting evidence and argues that the trial court erred by admitting evidence of his restricted driver's license. Although we conclude that sufficient evidence was presented at trial to support the Defendant's conviction, we conclude that evidence concerning the Defendant's restricted driver's license was improperly admitted at trial. We therefore reverse the Defendant's conviction and remand the case to the trial court for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Reversed and Remanded**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and THOMAS T. WOODALL, J., joined.

John C. Cavett, Jr., Chattanooga, Tennessee, for the Appellant, James Wesley Strombergh.

Paul G. Summers, Attorney General and Reporter; Angele M. Gregory, Assistant Attorney General; William H. Cox, III, District Attorney General; and Thomas E. Kimball, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

On August 21, 1999, the Hamilton County Grand Jury charged the Defendant, James W. Strombergh, with third offense driving under the influence (DUI). Following a bifurcated trial conducted on April 19, 2000, a Hamilton County jury convicted the Defendant of the offense charged and imposed a fine of $10,000. The trial court sentenced the Defendant to serve eleven months and twenty-nine days in the Hamilton County Workhouse, ordered him to attend an alcohol rehabilitation program, and revoked his license for a period of five years. In this appeal as of right,

the Defendant presents two issues for our review: (1) whether sufficient evidence was presented at trial to support his conviction, and (2) whether the trial court erred by allowing the State to question the Defendant about his restricted driver's license. Having reviewed the record, we conclude that the trial court improperly admitted evidence concerning the Defendant's restricted driver's license. We therefore reverse the judgment of the trial court and remand the case for a new trial.

The following evidence was presented at the Defendant's trial: Detective James Usry of the Hamilton County Sheriff's Department testified that on August 21, 1999, he was dispatched to an automobile accident involving two vehicles on Signal Mountain. One of the vehicles was driven by the Defendant, and the second vehicle was driven by Joy Clark. When Detective Usry arrived, he observed the Defendant "leaning up against" his truck and "chewing mints." Detective Usry reported that the Defendant "wouldn't let a hand leave the truck" and that the Defendant "was steadying himself by the truck at all times." The detective stated that when he asked the Defendant for his driver's license and vehicle registration, he noticed that the Defendant was moving slowly and noted "a strong odor of alcohol." Based upon these observations, Detective Usry asked the Defendant to perform field sobriety tests. The detective reported that the Defendant performed "very poorly" on the tests and concluded that the Defendant "was impaired . . . to the level where he shouldn't be driving."

Detective Usry testified that since the time of the Defendant's arrest, he had lost his written observations of the Defendant's field sobriety tests and stated that he was "testifying off of . . . a copy of the arrest report." However, he recalled that the Defendant had "difficulty with the test[s]." Usry testified that the Defendant reported no physical defects or injuries at the scene that would affect his performance on the tests. Usry also stated that the Defendant refused to take a breath alcohol test after the accident.

On cross-examination, Detective Usry testified that after he placed the Defendant under arrest, the Defendant told him that he had been drinking. Usry admitted that he did not include this information in his sworn Affidavit of Complaint, but he claimed that he included it in his notes, which he could not locate before trial. In addition, Usry admitted that he failed to include in his arrest report that the Defendant "smelled strongly of intoxicating type beverage," although he maintained that he had also included this information in his misplaced notes made at the time of the arrest. With regard to his failure to include this information in the arrest report, Usry testified, "I probably made a mistake by not mentioning it." He also admitted that when making five prior DUI arrests, he had noted in each arrest report that he had detected the odor of alcohol on each of the subjects.

On redirect examination, Detective Usry testified that he does not normally include in an affidavit all of the information that he learns at the scene of the crime. He stated that in each affidavit, he includes only sufficient information to establish probable cause. Usry further testified that although he determined that the Defendant was not at fault in the accident in this case, he did not include this information in the affidavit of arrest.

Joy Diane Clark testified that she drove the other vehicle involved in the accident with the Defendant on the day of his arrest for DUI. She recalled that when the accident occurred, she and her daughter-in-law were returning home from a flea market on Signal Mountain. She stated that she was rounding a curve on the mountain at a speed of approximately fifteen miles per hour when she saw the Defendant's truck driving towards her in her lane. Clark reported that the Defendant "had to be going at least 30" miles per hour. She testified, "[W]hen I came around the curve he was already there and he had to kind of swerve back, but I closed my eyes[,] . . . put my foot on the brake . . . and got ready for impact because there was nowhere for me to go, and he ran up on us." Clark recalled that after the collision, she was "trying to get [herself] back together" and looking for her cellular phone when the Defendant approached her car. She stated that the Defendant placed his hands on the top of her car and said, "Lady, look what you did to my truck, you were driving too fast." Clark testified that the Defendant's "skin was very red" and that "there were fumes, an odor, of alcohol." She specified that "[i]t wasn't beer, it was liquor . . . [which has] a different odor."

Clark recalled that the Defendant then went back to his truck, "hit his truck and kind of kicked it and then . . . got in it." She stated that although one of the Defendant's tires had exploded in the accident, the Defendant "backed up and . . . went forward and . . . backed up and . . . went forward." Clark testified that she asked her daughter-in-law to stand in front of the Defendant's truck to prevent the Defendant from leaving the scene. Clark stated that she then called 911, and officers soon arrived at the scene.

On cross-examination, Clark testified that Detective Usry determined that the accident was not the Defendant's fault. However, she contested this conclusion. She also stated that her insurance premium had increased as a result of the accident.

Martha Strombergh, the Defendant's mother, testified that the Defendant grew up in Manhattan and pointed out that he still has a New York accent. She stated that as a child, the Defendant attended speech therapy and "still mumbles a lot when he gets upset . . . ." Ms. Strombergh also reported that approximately twelve years prior to the trial, the Defendant fell from a three-story building while working. She stated that the Defendant, who sustained serious back and head injuries in the fall, was in a coma after the accident. Ms. Strombergh testified that she took care of her son for two to three years after this accident because he was unable to "stay out of bed long." She further testified that the Defendant suffers from continued physical problems resulting from the work-related accident and that he also developed emotional problems due to head injuries sustained in the fall. She stated, "[H]e gets upset very easy, and . . . he gets irritable. . . . [H]is brain was swollen from the accident for a while there and he used to have an awful lot of trouble with his head."

Ms. Strombergh testified that the Defendant was living with her on the date of the automobile accident in this case. She recalled that the Defendant was at home all morning on the day of the accident until approximately 2:30 p.m., when he left the house to go to the drugstore to purchase aspirin for his back pain and "blood thinner" for his mother. Ms. Strombergh maintained that her son did not consume any alcohol on the day of the accident. She stated she did not see the Defendant

drinking and that she did not smell alcohol on his breath on August 21, 1999. In addition, she testified that there was no alcohol in their house for him to drink. However, Ms. Strombergh also admitted that her son "drank a little now and then."

The Defendant testified on his own behalf at trial. He first verified his mother's testimony that he was injured in a work-related accident in New York City approximately thirteen years before trial. He testified that he moved to Tennessee following the accident so that his mother could take care of him, and he stated that he still suffered from chronic pain resulting from the accident.

The Defendant testified that on August 21, 1999, he awoke at approximately 5:30 a.m., drank a pot of coffee, and read the newspaper. The Defendant reported that he remained at his home until some time after 2:00 p.m., when he left to drive to the drugstore. He stated that his mother was in the same room with him all morning. The Defendant maintained that he consumed no alcohol on the day of the automobile accident, but he reported that he did drink vinegar and water.

The Defendant stated that he could not recall how the automobile accident occurred. He testified, "I would say I don't know how it happened, they just come around that curve and next thing I know I got whacked and . . . I don't remember nothing." The Defendant reported that his head hit the back window of his truck during the accident and that he "bruised a rib . . . [and] hit the steering wheel." He testified, however, that he did not see a doctor about his injuries until a few days after the accident because he "was hurting" and "didn't want to move."

The Defendant claimed that after the accident which resulted in his arrest, he was "dazed" and had trouble moving because of his injuries. He denied ever approaching Joy Clark's vehicle after the wreck and claimed that he merely called to Clark from his vehicle to inquire if she was alright. The Defendant also denied attempting to leave the scene of the accident before police arrived. The Defendant testified that he refused to take a breath alcohol test after the accident because he saw a man wearing a white shirt with "Police" printed on it that "[took] the passenger [in Clark's vehicle] away" from the scene. He stated, "And you know what happens in L.A., New York, I seen it all the time." When asked whether he told Detective Usry at the scene that he had been drinking, the Defendant replied that he did not recall making any such statement and stated, "All I know is I didn't know what was going on."

On cross-examination, the Defendant stated that on the day of the accident, he was driving on a restricted license that he was instructed to use only to drive to and from work. However, he admitted that he was not working at the time of the accident because he did not have a job. When asked whether he had committed fraud to obtain the restricted license, the Defendant maintained that he planned to get a job that "didn't come through" and stated, "I wanted a restricted license so I could drive [my mother] back and forth to the doctors." However, he also stated, "If I can get a restricted license, . . . I'll say anything, because I don't want [my mother] to drive."

Richard P. Jahn, Jr., an attorney, testified that he had known the Defendant for approximately twenty years. He stated that he met the Defendant at church in Tennessee before the Defendant

moved to New York, where he was involved in a construction accident at work. Jahn stated that after the accident, the Defendant returned to Tennessee to live with his parents on Signal Mountain. Jahn reported that the Defendant received a monetary settlement after the accident in New York. He testified, "[W]hen [the Defendant] recovered from this accident, let's say [he is] not normal emotionally, and all his friends were coming and trying to borrow money from him. . . . [H]e was not able to tell them no, so I was basically hired to be a trustee for his money. . . . [a]nd . . . that . . . has been my role to this day." Jahn stated that he had met with the Defendant at least once a month, but frequently two to three times a month, for the past twelve years to discuss the Defendant's money. He testified as follows concerning the Defendant's emotional state: "What I have observed is that he is much more sensitive than what I'd say a normal person is emotionally and things throw him off emotionally that would not throw off normal people."

Elish Burchard testified that she was the passenger in Joy Clark's car at the time of Clark's collision with the Defendant. Burchard stated that she had had four wisdom teeth pulled two days prior to the accident and was therefore taking pain medication at the time of the accident. She explained that because of this, she could not "remember every small little detail" about the accident. However, Burchard recalled that after the wreck, the Defendant emerged from his truck, walked to the front end of the truck to survey the damage to his vehicle, and then "kind of hit his hand on the hood like he was . . . discouraged or a little bit angry or whatever." She testified that the Defendant was "a little stumbly" when he got out of his truck, stating, "at the time I don't [sic] know if it was because of the accident or what." Burchard stated that the Defendant next got back into his truck and "tried to start it, to see if it would start . . . I guess, and [the truck] kind of went forward and come back a little bit." She further testified that she thought "maybe right after the accident," the Defendant approached Clark's car. However, she stated that she did not actually see the Defendant approach Clark's car because she was "digging for the cellphone" to call the police. She also testified that she "didn't get close enough to" the Defendant to smell alcohol on his person. Finally, Burchard testified that her fiancé, not a police officer, escorted her from the scene. She stated that he may have been wearing a t-shirt with a "Police" logo on it at the time.

## I. SUFFICIENCY OF THE EVIDENCE

The Defendant contests the sufficiency of the convicting evidence. When an accused challenges the sufficiency of the evidence, an appellate court's standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 324 (1979); State v. Duncan, 698 S.W.2d 63, 67 (Tenn. 1985). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. State v. Buggs,

995 S.W.2d 102, 105 (Tenn. 1999); Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. Liakas, 286 S.W.2d at 859. This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. Id.

The Defendant argues that no evidence was introduced indicating that he "contributed to the accident in any way" and emphasizes that he was not found at fault for the accident. He also points to Detective Usry's failure to include specific information in the Affidavit of Complaint. The Defendant further contends that no evidence was presented to show that he consumed alcohol on the day of the accident and that his behavior at the scene could be attributed to injuries he suffered during the accident.

However, Detective Usry and Joy Clark, two of the individuals present at the scene on the day of the accident, testified that they detected an odor of alcohol emanating from the Defendant's person immediately after the accident. Detective Usry also testified that the Defendant performed poorly on field sobriety tests administered at the scene and that following his arrest, the Defendant admitted to drinking on the day of the accident. Furthermore, Elish Burchard testified that the Defendant was "a little stumbly" when he got out of his truck after the accident. This is sufficient evidence to support the Defendant's conviction. Finally, we note that the governing statute in this case does not require the State to prove that the Defendant caused the accident that resulted in his arrest, but rather only that the Defendant unlawfully operated an automobile while under the influence of an intoxicant on a public road of the State of Tennessee. See Tenn. Code Ann. § 55-10-401. We therefore conclude that this issue is without merit.

## II. EVIDENCE OF THE DEFENDANT'S RESTRICTED LICENSE

The Defendant contends that the trial court erred by admitting evidence concerning his restricted driver's license at trial. More specifically, the Defendant argues that the State should not have been allowed to cross-examine him concerning allegedly false statements that he made in his application for a restricted driver's license. He argues that introduction of this evidence allowed the jury to infer that he had been previously convicted of driving under the influence. The Defendant argues that the evidence was highly prejudicial and that it should not have been admitted pursuant to Rule 404(b) of the Tennessee Rules of Evidence. With certain exceptions, Tennessee Rule of Evidence 404(b) prohibits "[e]vidence of other crimes, wrongs, or acts . . . to prove the character of a person in order to show action in conformity with the character trait." The State argues that the evidence was properly admitted under Rule 608(b) of the Tennessee Rules of Evidence for purposes of impeachment. Although making false statements on an application for a restricted driver's license could certainly be considered evidence of other wrongs or bad acts committed by the Defendant, the

evidence in this case was offered during cross-examination of the Defendant to demonstrate that he was untruthful. Therefore, we believe, as does the State in this case, that it is more appropriate to analyze this issue under Rule 608(b) of the Tennessee Rules of Evidence.

Rule 608 of the Tennessee Rules of Evidence allows cross-examination of a witness regarding specific instances of conduct concerning the witness's character for truthfulness or untruthfulness if the following conditions are first satisfied: (1) "The court upon request must hold a hearing outside the jury's presence and must determine that the alleged conduct has probative value and that a reasonable factual basis exists for the inquiry" Tenn. R. Evid. 608(b)(1); (2) the conduct must have occurred less than ten years prior to the commencement of the prosecution; or if the conduct occurred more than ten years prior, the impeaching party must give the adverse party sufficient advanced notice to allow the adverse party to contest the use of the evidence, and the court must determine "in the interests of justice that the probative value of that evidence, supported by specific facts and circumstances, substantially outweighs its prejudicial effect," Tenn. R. Evid. 608(b)(2); and (3) "[i]f the witness to be impeached is the accused in a criminal prosecution, the State must give the accused reasonable written notice of the impeaching conduct before trial, and the court upon request must determine that the conduct's probative value on credibility outweighs its unfair prejudicial effect on the substantive issues," Tenn. R. Evid. 608(b)(3).

This Court has previously addressed this issue in State v. Fleece, a case involving almost identical circumstances to those in this case. 925 S.W.2d 558 (Tenn. Crim. App. 1995). In Fleece, the trial court allowed the State to introduce rebuttal evidence of the Defendant's restricted license at the Defendant's trial for DUI and reckless driving. Id. at 559-60. On appeal, this Court made the following comments: "We find no relevant purpose for introducing this evidence during the state's proof. Appellant was not charged with violation of a restricted license. Therefore, the evidence's sole relevance was raising an impermissible inference of a prior DUI conviction." Id. at 560. This Court concluded that "the prosecution's conduct crossed the line and gave rise to the impermissible inference that appellant had a previous DUI conviction." Id. at 561. We also concluded that the probative value of the evidence was outweighed by the danger of its unfair prejudice and noted that "[w]hen the state was permitted to raise such a strong inference of a prior DUI conviction, appellant's chance of receiving a fair trial became remote." Id.

The State argues, however, that the present case is entirely distinguishable from Fleece because there was a relevant purpose for introduction of the contested evidence: to attack the Defendant's credibility. The State points out that unlike the defendant in Fleece, the Defendant in this case "lied in order to obtain a restricted license and had never been employed." The State also argues that in Fleece, "this Court gave weight to the fact that the [trial] court allowed an employee from the criminal court clerk's office to testify regarding the defendant's restricted license" and that during examination of the witness "the defendant's prior DUI jacket was waived around and passed back and forth to the witness." The State points out that no such conduct occurred in this case.

Although this case is arguably distinguishable from Fleece, we conclude that evidence of the Defendant's restricted driver's license was improperly admitted under Tennessee Rule of Evidence

608(b). The State concedes that it failed to provide the Defendant with reasonable written notice of the impeaching conduct before trial. See Tenn. R. Evid. 608(b)(3). In certain circumstances, such as when a defendant makes a "sweeping claim of good conduct on direct examination," Tenn. R. Evid. 608 advisory comm'n cmts, failure to provide notice to the accused prior to impeachment does not prohibit admission of the impeaching conduct. However, no such circumstances are present in this case.

Furthermore, it is somewhat unclear from the record as to whether the trial court made a proper determination under Rule 608 concerning the probative value of the contested evidence. The trial court in this case conducted a brief bench conference prior to admitting the evidence. Nevertheless, many of the trial court's comments at the bench conference are not included in the record because they were inaudible. At the conclusion of the hearing, the trial court merely stated, "The whole issue in this case is credibility."

Based upon our review of the record, we conclude that the unfair prejudicial effect of the evidence outweighed its probative value as to the Defendant's credibility. This Court has stated that when "considering whether the probative value of prior convictions outweighs their prejudicial effect under either Rule 608 or 609 [of the Tennessee Rules of Evidence], trial courts must (a) 'assess the similarity between the crime on trial and the crime underlying the impeaching conviction' and (b) 'analyze the relevance the impeaching conviction has to the issue of credibility.'" State v. Steven O. Ford, No. 01C01-9403-CC-00089, 1995 Tenn. Crim. App. LEXIS 753, at \*12 (Tenn. Crim. App., Nashville, Sept. 14, 1995) (quoting Neil P. Cohen et al., Tennessee Law of Evidence § 609.9 (2d ed. 1990)). Although similarities between the impeaching offense and the crime for which the defendant is on trial do not, as a matter of law, render the impeaching evidence inadmissible, "the admission of a prior conviction which is closely related to the charged offense requires heightened scrutiny." Id. (citing Long v. State, 607 S.W.2d 482, 486 (Tenn. Crim. App. 1980)). By analogy, if the impeaching conduct is closely related to the charged offense, it stands to reason that heightened scrutiny is also required when determining whether evidence of the impeaching conduct should be admitted into evidence.

In this case, as in Fleece, the impeaching evidence "gave rise to the impermissible inference that appellant had a previous DUI conviction," 925 S.W.2d at 561, the same crime with which the Defendant stood charged at trial. We thus conclude, as did this Court in Fleece, that because admission of this evidence raised such a strong inference of a prior DUI conviction, the Defendant's "chance of receiving a fair trial became remote." Id. Furthermore, we simply cannot conclude that the trial court's error in admitting the impeaching evidence in this case did not affect the judgment or result in prejudice to the judicial process. See Tenn. R. App. P. 36(b); see also Tenn. R. Crim. P. 52(a). Therefore, we must REVERSE the judgment of the trial court and REMAND the case to the trial court for a new trial.

_____

ROBERT W. WEDEMEYER, JUDGE